**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeanette Rose Eakerns, | No. CIV 06-3009-PHX-SMM |
| Plaintiff, | **MEMORANDUM OF DECISION AND ORDER** |
| v. | |
| Kingman Regional Medical Center, | |
| Defendant. | |

Before the Court is Defendant Kingman Regional Medical Center's ("KRMC") Motion for Summary Judgment (Dkt. 77). Having considered the parties' memoranda and other submissions, the Court now issues this Memorandum of Decision and Order granting in part Defendant's motion as to Plaintiff's intentional infliction of emotional distress claim and denying in part as to the rest of Plaintiff's claims.[1]

///
///
///
///

---

[1] Plaintiff requested oral argument in its Response to the Motion for Summary Judgment (Dkt. 90). The parties have had the opportunity to submit evidence and briefing. Accordingly, the Court finds the pending motion for summary judgment suitable for decision without oral argument and Plaintiff's request is denied. See LRCiv 7.2(f), 56.2.

**FACTUAL BACKGROUND**

Plaintiff Jeanette Rose Eakerns ("Plaintiff") is an American Indian[2] and a member of the Hualapai Tribe (Dkt. 89, Pl.'s Statement of Facts ("PSOF") ¶ 1).  Plaintiff has lived on the Hualapai Reservation with her parents, and she has relatives who still live on the Reservation.  (Id.).  To this day, Plaintiff observes the customs, practices, and religious rites of the Hualapai Tribe (Id.).

In August 1984, Plaintiff began working for KRMC as a nursing assistant (Dkt. 89, Pl.'s Responsive Statement of Facts ("PRSOF") ¶ 1).  During the next 20 years, KRMC promoted Plaintiff throughout the hospital (Id. ¶ 2).  She became a registered nurse ("RN"), and she worked in various departments in different positions, including a supervisor position (Id.).  In 2004, she worked as a highly specialized RN in the Cardiac Catheterization Lab ("Cath Lab") (Id. ¶ 3).  Up until an incident that occurred on October 27, 2004, Plaintiff performed her job satisfactorily (PSOF ¶ 2).

On July 1, 2004, Plaintiff complained to KRMC Human Resources ("HR") Director Heather Crowl about sex discrimination and race discrimination (Id. ¶ 52).  With regards to sex discrimination, Plaintiff alleged that Muslim doctors mistreated female nurses in the Cath Lab (Id.).  With regards to race discrimination, Plaintiff raised a prior incident in which an employee had called her a "damned Indian" (Id.).  Plaintiff also alleged that the Cath Lab Supervisor, Jean Crilly, discriminated against a Hispanic agency nurse and against an applicant for a tech position who Crilly thought was African American (Id.).

Plaintiff made informal and formal complaints both before and after the July 1, 2004 complaint.  Plaintiff's Cath Lab Supervisor Bill Crome and former Director of Operational Services Mike Clark told Crowl that Plaintiff had "a history of creating problems centered

---

[2] Both parties use the terms Indian and Native American interchangeably.  The Court will also use the terms interchangeably for the reasons discussed in <u>Dawavendewa v. Salt River Project Agricultural Improvement and Power District</u>.   154 F.3d 1117, 1118 n. 1 (9th Cir. 1998) (recognizing that the term Native American has become a part of the common parlance, but statutes and opinions use the term Indian).

around . . . discrimination claims" (Id. ¶ 54).  Chief Nursing Officer Beverly (Bev) Mracek, R.N., an alleged decision maker, viewed Plaintiff as having a "chip on her shoulder" and not being able to "get past it" – the fact that she was Native American (PRSOF ¶ 25).  Mracek also stated that Plaintiff's discrimination complaints were a "cloud she carries around with her" (Id.).

On October 27, 2004, two of Plaintiff's nephews experienced an automobile accident (Id. ¶ 5).  They were sent to KRMC's Emergency Department ("ED") (Id.).  While Plaintiff was working in the Cath Lab, ED Nurse Faith McKinney called Plaintiff twice to make her aware of her nephews' presence in the ED (Id. ¶ 6).  In response, Plaintiff and a Cath Lab co-worker, Debbie Riger, R.N., went to the ED (Id.).  Plaintiff learned that one of her nephews, 16-year-old Reid Smith, Jr., was in a trauma room (Id.).  Plaintiff found her nephew and his mother (her sister), Ann Has the Pipe, in the room (Id. ¶ 7).  Ann Has the Pipe was upset and crying (PSOF ¶ 23).  Reid had been placed on a spinal backboard to stabilize his spine and pelvis because he complained of pain (PRSOF ¶ 8).  Reid was also uncovered, shivering from cold, and needed to use the restroom (Id. ¶ 6).  Plaintiff went to the nurses' station in order to get a warm blanket and a portable urinal for him to relieve himself (Id.).  Plaintiff also tried to figure out how to help alleviate his pain (Id.).  Plaintiff asked McKinney if the treating physician had seen the patient, if x-rays had been completed, and if C-spine precautions were no longer in use (Id. ¶ 9).  McKinney responded affirmatively (Id.).  After McKinney left the room, Plaintiff asked her sister if she knew why Reid was still on the backboard, and her sister replied that she did not (Id.).  Plaintiff also conferred with Riger, and they both decided to remove Reid from the backboard in order to ease his pain and discomfort (Id.; PSOF ¶ 23).  No doctor had ordered the removal of the backboard (PRSOF ¶ 12).  Plaintiff and Riger then removed Reid from the backboard (Id. ¶ 9).

KRMC had assigned Dr. Michael Ward as Reid's treating physician (Id. ¶ 13).  On the same day that Plaintiff removed the backboard, Plaintiff and her sister filed an internal complaint against Dr. Ward (Id. ¶ 15).  Dr. Ward made an inappropriate remark to Reid that they believed was sexual harassment (Id.).  During a digital rectal exam, Dr. Ward made a

1    statement along the lines of, "Don't expect to marry me after this and don't be calling late

2    at night" (Id. ¶ 16).  Reid is a teenage boy with long hair.  During the rectal exam, he was

3    half-naked with his mother and another male doctor or intern present (Id.).  Plaintiff, Ann

4    Has the Pipe, and Reid considered Dr. Ward's remarks highly offensive (Id.).

5         On November 4, 2004, KRMC terminated Plaintiff because she removed the

6    backboard from her nephew Reid (PSOF ¶ 3).  HR Director Crowl, Cath Lab Supervisor

7    Crome, Chief Nursing Officer Mracek, and Chief Financial Officer/Chief Operations Officer

8    ("CFO/COO") Larry Lewis were the four decision makers (Dkt. 90, 4:8-5:19).  KRMC stated

9    these reasons for Plaintiff's termination: (1) practice outside the scope of her nursing license,

10   (2) interference with patient treatment, and (3) unprofessional behavior (PSOF ¶ 4).

11        Like Plaintiff, Dennis Sherer worked as a registered nurse under Bill Crome's ultimate

12   supervision (Id. ¶ 15).  In 2005 while inserting a PICC line, Sherer administered fluoroscopy

13   to a patient without a radiologist present (Id. ¶ 21).  A PICC line is intended to run

14   intravenously to the patient's heart (PRSOF ¶ 29).  A radiologist takes a flouroscopy (a

15   radiological image) of the patient's chest during the procedure to ensure that the line was

16   properly placed (Id. ¶ 30).  On April 4, 2005, KRMC warned Sherer against practicing

17   outside the scope of his license (Id. ¶ 28).  KRMC did not terminate Sherer at this time.

18        On January 8, 2007, Plaintiff filed her Second Amended Complaint asserting five

19   claims:  (1) race discrimination in violation of Title VII of the 1964 Civil Rights Act ("Title

20   VII"), (2) race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"), (3)

21   retaliation in violation of Title VII, (4) retaliation in violation of 42 U.S.C. § 1981, and (5)

22   intentional infliction of emotional distress (Dkt. 12).[3]

23                              **STANDARD OF REVIEW**

24        A court must grant summary judgment if the pleadings and supporting documents,

25   viewed in the light most favorable to the nonmoving party, "show that there is no genuine

26   _____

27        [3] During her deposition, Plaintiff testified she was also pursuing a gender discrimination
     claim, and her attorneys reserved the right to bring one.  However, Plaintiff did not allege this claim
28   in her Second Amended Complaint.  Therefore, the Court will not entertain such claim.

1  issue as to any material fact and that the moving party is entitled to judgment as a matter of

2  law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

3  Jesinger v. Nev. Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994).  Substantive law

4  determines which facts are material.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248

5  (1986); see also Jesinger, 24 F.3d at 1130.  "Only disputes over facts that might affect the

6  outcome of the suit under the governing law will properly preclude the entry of summary

7  judgment."  Anderson, 477 U.S. at 248.  The dispute must also be genuine.  That is, the

8  evidence must be "such that a reasonable jury could return a verdict for the nonmoving

9  party."  Id.; see Jesinger, 24 F.3d at 1130.

10  A principal purpose of summary judgment is "to isolate and dispose of factually

11  unsupported claims."  Celotex, 477 U.S. at 323-24.  Summary judgment is appropriate

12  against a party who "fails to make a showing sufficient to establish the existence of an

13  element essential to that party's case, and on which that party will bear the burden of proof

14  at trial."  Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir.

15  1994).  The moving party need not disprove matters on which the opponent has the burden

16  of proof at trial.  See Celotex, 477 U.S. at 323-24.  The party opposing summary judgment

17  need not produce evidence "in a form that would be admissible at trial in order to avoid

18  summary judgment."  Id. at 324.  However, the nonmovant "may not rest upon the mere

19  allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing

20  that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see Matsushita Elec. Indus. Co.,

21  Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-88 (1986); Brinson v. Linda Rose Joint

22  Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).

23  **DISCUSSION**

24  KRMC seeks summary judgment on all of Plaintiff's claims, asserting that her race

25  discrimination claims fail under McDonnell Douglas, her retaliation claims fail for lack of

26  a nexus, and she cannot prove her intentional infliction of emotional distress claim (Dkt. 77).

27  ///

28  ///

I.     **Race Discrimination under Title VII and Section 1981**

In her Second Amended Complaint, Plaintiff asserts a race discrimination claim under Title VII and Section 1981 against KRMC for terminating her on November 4, 2004 (Dkt. 12, ¶¶ 20, 22). Title VII protects against discrimination on the basis of an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). A person suffers disparate treatment in his employment "when he or she is 'singled out and treated less favorably than others similarly situated on account of race.'" See McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1121 (9th Cir. 2004) (quoting Jauregui v. City of Glendale, 852 F.2d 1128, 1134 (9th Cir. 1988)). In analyzing claims under Section 1981, courts apply "the same legal principles as those applicable in a Title VII disparate treatment case." Metoyer v. Chassman, 504 F.3d 919, 930 (9th Cir. 2007) (quoting Fonseca v. Sysco Food Servs. of Ariz., Inc., 374 F.3d 840, 850 (9th Cir. 2004). Therefore, the Court will analyze Plaintiff's race discrimination claims under Title VII and Section 1981 together.

**A.  Prima Facie Case**

To establish a prima facie case under Title VII and Section 1981, plaintiff must offer proof that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she experienced an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If plaintiff establishes a prima facie case, then defendant has the burden of producing a legitimate nondiscriminatory reason for its employment decision. See Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). If defendant meets this burden, plaintiff must raise a genuine issue of material fact that defendant's reason is a pretext for discrimination – i.e., the reason is false or the true reason was a discriminatory one. See id.

Here, Plaintiff established the first three elements of a prima facie disparate treatment claim on the basis of race. Plaintiff submitted proof: (1) that she is Native American, a protected class under Title VII (PSOF ¶ 1); (2) that she was qualified for her position as a

1    R.N. (Id. ¶ 2; PRSOF ¶¶ 2-3); and (3) that she was terminated, an adverse employment action
2    (PSOF ¶ 2).  See McDonnell Douglas, 411 U.S. at 802.

3           In order to establish the fourth element that similarly-qualified employees outside her
4    protected class were treated more favorably, Plaintiff presents evidence that KRMC
5    disciplined three other registered nurses, Dennis Sherer, Erin Moore, and Debra Riger, in a
6    more favorable manner (PSOF ¶¶ 10-22, 28-39).  KRMC argues, though, that Plaintiff cannot
7    prove she was treated less favorably than a similarly situated employee outside her protected
8    class (Dkt. 77, 4:17-18).

9           A plaintiff must show that she is "similarly situated to those employees in all material
10   respects."  Moran v. Selig 447 F.3d 748, 755 (9th Cir. 2006) (citing Aragon v. Republic
11   Silver State Disposal, Inc., 292 F.3d 654, 660 (9th Cir. 2002)).  "Individuals are similarly
12   situated when they have similar jobs and display similar conduct."  Vasquez v. County of Los
13   Angeles, 349 F.3d 634, 641 (9th Cir. 2003).

14                a.  Dennis Sherer

15          Plaintiff cites Dennis Sherer as a similarly situated registered nurse who practiced
16   outside the scope of his nursing license and exhibited unprofessional behavior (PSOF ¶¶ 15-
17   22).  However, KRMC did not terminate him (Id. ¶ 13).  KRMC contends that Sherer is not
18   similarly situated because he did not display similar conduct of comparable seriousness (Dkt.
19   77, 4:21-5:2).  Furthermore, KRMC alleges that Sherer is Native American, and therefore,
20   he is within Plaintiff's protected class (DSOF ¶¶ 39-40).

21          First, KRMC essentially argues that Sherer could not have possibly harmed his patient
22   while inserting the PICC line on April 4, 2005; therefore, Sherer's conduct was entirely
23   different than Plaintiff's (Dkt. 77, 6:17-18).  Courts have found employees were not similarly
24   situated when they "did not engage in problematic conduct of comparable seriousness."  See
25   Vasquez, 349 F.3d at 641.  Both Sherer and Plaintiff committed the same offense – practice
26   outside the scope of a nursing license (PSOF ¶ 18).  Both Sherer and Plaintiff allegedly acted
27   out of concerns for the patient's comfort and/or safety (DSOF ¶ 32; PRSOF ¶ 6; Dkt. 90,
28   6:17-23).

1    As such, the heart of the parties' dispute is whether Sherer *could have* seriously

2    harmed his patient, which might make the conduct of comparable seriousness to Plaintiff's.

3    Plaintiff alleges that Sherer could have harmed his patient by administering the fluoroscopy

4    (PRSOF ¶ 32), which KRMC denies.  Further, Plaintiff alleges Sherer "put the patient in

5    grave danger" by leaving the patient with an unsecured catheter near the heart in order to find

6    the radiologist (Id.).  The unsecured catheter could have migrated into the heart causing

7    fibrillation leading to cardiac arrest (Id.).  KRMC alleges it reported Sherer's conduct to the

8    appropriate regulatory agency, which took no disciplinary action against him (DSOF ¶¶ 35-

9    37).  However, Plaintiff disputes that KRMC properly reported Sherer (PRSOF ¶¶ 35-37).

10   Ultimately, neither Sherer's patient or Plaintiff's nephew received any harm (Dkt. 90, 6:25-

11   26).  Based on the evidence before the Court, the Court cannot determine as a matter of law

12   whether Sherer or Plaintiff could have harmed his patient or her nephew, respectively.

13   Plaintiff has raised a genuine dispute over a material fact of whether Sherer's conduct was

14   of comparable seriousness to Plaintiff's.

15       Furthermore, Plaintiff alleges that Sherer received more favorable treatment.  Before

16   the 2005 incident with the PICC line, KRMC had previously warned Sherer against practice

17   outside the scope of his license.  Plaintiff's husband Ray Eakerns, who was Sherer's

18   immediate supervisor, had repeatedly verbally warned Sherer against administering

19   fluoroscopy without a radiologist present (PRSOF ¶ 36).  Sherer admitted that Eakerns

20   verbally warned him at least three to five times (PSOF ¶ 28).  Plaintiff also produced

21   evidence that KRMC warned Sherer in writing through his 2001-2002 performance

22   evaluation that he "overstep[s] his boundaries by doing things that should be done by a

23   physician. This must cease immediately" (Dkt. 89, Ex. 47).  Moreover, Plaintiff also

24   produced evidence that Sherer received other disciplinary warnings, including one for

25   gambling on the job (PSOF ¶ 17).  After the 2005 incident, KRMC placed Sherer on leave

26   for three days, and then he returned to work (PRSOF ¶ 34).  KRMC continued its

27   investigation from April 5, 2005 to June 7, 2005 (Id.).  In contrast, Plaintiff had been

28   performing her job satisfactorily up until the October 27, 2004 incident (PSOF ¶ 2).  HR

1    Director Crowl oversaw both Sherer's and Plaintiff's investigations, and she participated in

2    the decision making.  While Crowl recommended Plaintiff's termination, she recommended

3    only a warning for Sherer.  While Crowl's investigation of Sherer lasted over two months,

4    Plaintiff alleges that Crowl's investigation of her lasted one day (Id. ¶ 30).   Another

5    employee, Crome, did not even conduct an investigation before KRMC fired Plaintiff (Id.).

6    Plaintiff has created an inference that KRMC treated a similarly situated employee more

7    favorably.

8            Second, KRMC advances an uncommon argument that Sherer is part Native American

9    so that he is within Plaintiff's protected class.  Plaintiff contends that KRMC and Sherer have

10   acted with the understanding that Sherer was white (Dkt. 90, 3:2-3).  "Title VII must be

11   construed liberally in order to effectuate the broad remedial purpose of Congress to eliminate

12   the inconvenience, unfairness, and humiliation of ethnic discrimination."  Silver v. KCA,

13   Inc., 586 F.2d 138, 141 (9th Cir. 1978) (internal citation omitted).  Title VII's objective is

14   "to achieve equality of employment opportunities and remove barriers that have operated in

15   the past to favor *an identifiable group of white employees* over other employees."  Gibson

16   v. Local 40, Supercargoes and Checkers of Intern. Longshoremen's and Warehousemen's

17   Union, 543 F.2d 1259, 1265 (9th Cir. 1976) (quoting Griggs v. Duke Power Co., 401 U.S.

18   424, 429-30 (1971) (emphasis added)).

19           The Ninth Circuit has considered a plaintiff's allegation that an individual is "white

20   looking."  In Aragon v. Republic Silver State Disposal Inc., a white plaintiff alleged that his

21   employer laid off white or white-looking individuals while non-white individuals remained

22   employed.  292 F.3d at 657.  In the lay-off context, plaintiff must show that his layoff

23   "occurred under circumstances giving rise to an inference of discrimination"  Id. at 660

24   (citing Coleman v. Quaker Oats Co., 232 F.3d 1271, 1281 (9th Cir. 2000).  The Ninth Circuit

25   upheld the district court's finding that plaintiff had put forth sufficient evidence of white or

26   white-looking individuals being laid off in order to meet his minimal prima facie burden.  Id.

27   at 660.

28   ///

1    Plaintiff alleges that Sherer identifies himself as a white employee, and KRMC

2    employees view Sherer as such (PSOF ¶¶ 10-14; PRSOF ¶¶ 39-40).  For instance, Ryan

3    Kennedy, who disciplined and later discharged Sherer in April 2008, testified that he

4    understood Sherer was a white male (Dkt. 90, Ex. 7, 31:4-6, 93:8-20).  Furthermore, Plaintiff

5    has produced evidence that KRMC identified him as a white employee on a personnel

6    document (Dkt. 90, Ex. 25).  The Court refrains from determining whether Sherer is a Native

7    American.  While the term Indian may have a particular meaning under a specific statute,[4]

8    Title VII must be liberally construed to remove barriers that operate to favor "an identifiable

9    group of white employees" over other employees.  See Silver, 586 F.2d at 141; Gibson, 543

10   F.2d at 1265.  Therefore, Plaintiff has met her minimal showing necessary to establish a

11   prima facie case by producing evidence of "white or white-looking individuals" who were

12   treated more favorably.  See Aragon, 292 F.3d at 660; see also Chuang v. Univ. of Cal.

13   Davis, Bd. of Trustees., 225 F.3d 1115, 1124 (9th Cir. 2000) ("Under the McDonnell

14   Douglas framework, '[t]he requisite degree of proof necessary to establish a prima facie case

15   for Title VII . . . on summary judgment is minimal and does not even need to rise to the level

16   of a preponderance of the evidence.'") (quotation omitted).

17        b.  Erin Moore

18        Plaintiff also cites Erin Moore as a similarly situated registered nurse who practiced

19   outside the scope of her nursing license.  Plaintiff alleges that Moore took KRMC supplies

20   and provided intravenous (IV) treatment to another KRMC employee, Henry Mayo, in his

21   home (PSOF ¶ 34; PRSOF ¶ 42).  Plaintiff further alleges that she reported this practice

22   outside the scope of a nursing license to her supervisor, Crome (PSOF ¶ 34).

23

24        [4] Recently, the Ninth Circuit grappled again with the question of "whether a particular

25   individual 'counts' as an Indian" for the United States government to exercise criminal jurisdiction
     over him.  United States v. Cruz, 554 F.3d 840, 842 (9th Cir. 2009).  In this context, the Ninth

26   Circuit applied its "specific test for determining whether an individual can be prosecuted by the
     federal government under 18 U.S.C. § 1153."  Id.  This test requires the government to prove that

27   a "defendant has a sufficient 'degree of Indian blood,' and has 'tribal or federal government

28   recognition as an Indian.'"  Id. at 845.

- 10 -

1    KRMC alleges that it has no record of Moore practicing outside the scope of her

2    nursing license, and Plaintiff has no evidence to support her claim (DSOF ¶ 43).  Because

3    there is no evidence that KRMC knew of Moore's conduct, KRMC argues that Moore is not

4    similarly situated to Plaintiff (Dkt. 77, 8:11-18).  KRMC cites the Second Circuit's decision

5    in Shumway v. United Parcel Serv., Inc., 118 F.3d 60 (2d Cir. 1997), as authority.   In

6    Shumway, the Second Circuit concluded that "[i]t is impossible to demonstrate that UPS

7    treated similarly situated males differently when there is no evidence that UPS knew about

8    any other violations."  Id. at 64-65.  The Second Circuit found that plaintiff's sweeping

9    allegations were conclusory statements unsupported by admissible evidence.  Id. at 65.

10   Therefore, the Second Circuit held that plaintiff had not raised a genuine issue of material

11   fact and granted summary judgment in defendant's favor.  Id.

12          Although  the Second Circuit's decision is not controlling here, the Court finds their

13   reasoning persuasive.  While Plaintiff alleges that she told Crome about Moore's behavior,

14   Plaintiff has not produced any evidence that KRMC had knowledge or a record of Moore

15   engaging in this improper behavior (See PRSOF ¶¶ 45-46).  Plaintiff never documented this

16   practice or submitted a written complaint to KRMC (Id.).  Furthermore, KRMC alleges that

17   it only learned of this allegation after Plaintiff filed her EEOC charge (DSOF ¶ 46).  Indeed,

18   this is the only written report about Moore's behavior produced.  KRMC then conducted an

19   investigation, which produced no evidence of the alleged improper conduct (Id.).  Plaintiff's

20   allegations are conclusory statements unsupported by admissible evidence, and Plaintiff

21   cannot demonstrate that KRMC treated Moore differently when there is no evidence that

22   KRMC knew about her improper behavior.  See Shumway, 118 F.3d at 64-65.  As KRMC

23   did not treat Moore differently, the Court need not address KRMC's allegations that Moore

24   is also part Native American.

25          c.  Debra Riger

26          Finally, Plaintiff presents Debra Riger as a similarly situated registered nurse who

27   practiced outside the scope of her nursing license.  Riger was present during the October 27,

28   2004 incident that led to Plaintiff's termination (PSOF ¶ 23).  KRMC admits that Plaintiff

1    conferred with Riger, and they both decided to remove Plaintiff's nephew from the

2    backboard (Dkt. 93, Def.'s Response to PSOF ("DRSOF") ¶ 23).  Plaintiff further alleges

3    that Riger helped Plaintiff remove the backboard from her nephew (PSOF ¶ 37).  Similar to

4    its arguments regarding the Moore allegations, KRMC claims it had no knowledge of Riger's

5    participation in the incident.  Further, KRMC claims Plaintiff did not identify Riger when

6    KRMC first disciplined her, when she confronted Dr. Ward, or when she was terminated

7    (DSOF ¶¶ 51-53).  Therefore, KRMC argues that Riger is not a similarly situated employee

8    (Dkt. 77, 10:2-7).  However, this situation can be distinguished from Moore's because

9    KRMC admits that it knew another nurse was with Plaintiff at the time she removed the

10   backboard from her nephew (DRSOF ¶ 38).  Further, KRMC admits that it did not

11   investigate Riger's involvement in the incident, and it accepted McKinney's statement at face

12   value that the ED staff did not help Plaintiff (Id. ¶ 39).  Unlike KRMC's argument regarding

13   Moore that it had no knowledge of her actions, KRMC knew of the backboard incident and

14   had an opportunity to investigate.  Although KRMC argues that it was not made aware of

15   Riger's involvement, it did not investigate the incident when it knew another employee could

16   be involved.  The fact that KRMC did not investigate Riger also lends support to Plaintiff's

17   allegation that KRMC treated Riger, a white employee, more favorably.

18          The Court finds that Plaintiff has produced the requisite degree of proof necessary to

19   establish a prima facie case that other employees with similar qualifications were treated

20   more favorably.  See Chuang, 225 F.3d at 1124 ("Under the McDonnell Douglas framework,

21   '[t]he requisite degree of proof necessary to establish a prima facie case for Title VII . . . on

22   summary judgment is minimal and does not even need to rise to the level of a preponderance

23   of the evidence.'") (quotation omitted).  As a result, Plaintiff is entitled to a presumption that

24   KRMC terminated her because she is Native American.  See McDonnell Douglas, 411 U.S.

25   at 802.  The burden now shifts to KRMC to produce evidence of a legitimate and

26   non-discriminatory reason for terminating Plaintiff.  Vasquez, 349 F.3d at 640.

27   ///

28   ///

1

### B.  Legitimate and Non-discriminatory Reasons

2      Plaintiff concedes that she removed the backboard without a physician's orders

3  (PRSOF ¶ 12).  KRMC presents evidence that this action constitutes practice outside the

4  scope of a nursing license.  By presenting evidence that it terminated Plaintiff for practice

5  outside the scope of her nursing license, interference with patient treatment, and

6  unprofessional behavior, KRMC has met its burden of demonstrating legitimate and

7  non-discriminatory reasons for terminating Plaintiff's employment (See DSOF ¶ 22).

8

### C.  Pretext

9      Plaintiff is now required to produce evidence sufficient to create a genuine issue of

10  fact as to whether KRMC's legitimate and non-discriminatory reasons were a mere pretext

11  for discrimination.  Plaintiff "can show pretext directly, by showing that discrimination more

12  likely motivated the employer, or indirectly, by showing that the employer's explanation is

13  unworthy of credence" because it is inconsistent or otherwise not believable.  Vasquez, 349

14  F.3d at 641; Dominguez-Curry v. Nev. Transp. Dept., 424 F.3d 1027, 1037 (9th Cir. 2005).

15  "To show pretext using circumstantial evidence, a plaintiff must put forward specific and

16  substantial evidence challenging the credibility of the employer's motives."  Vasquez, 349

17  F.3d at 642; Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1222 (9th Cir. 1998) (holding that

18  circumstantial evidence of pretense must be "specific" and "substantial" in order to create

19  a triable issue).

20      Both Plaintiff and KRMC focused much of their arguments on Plaintiff's burden to

21  establish a prima facie case of discrimination.  As noted, a prima facie case of discrimination

22  requires a minimal showing, which Plaintiff has met.  When discussing pretext, both parties

23  used conclusory statements rather than factual analysis (See Dkt. 77, 10:20-24) ("Whatever

24  other evidence Eakerns may have to establish a *prima facie* case, she cannot prove that

25  KRMC's reasons for ending her employment were pretextual, and that the real reason for her

26  discharge was discrimination.") (See also Dkt. 90, 13:18-27).  KRMC did not advance its

27  substantive arguments regarding pretext until its reply, and Plaintiff did not have the

28  opportunity to respond to them (See Dkt. 92, 4:7-5:17).  As the same evidence that makes out

a prima facie case may be relied upon to establish pretext, the Court will treat Plaintiff's arguments regarding racial bias and similarly situated employees as her position regarding pretext.  See Miller v. Fairchild Indus., Inc., 797 F.2d 727, 732 (9th Cir. 1986).  When viewed in the light most favorable to Plaintiff, this argument creates a genuine issue of material fact as to whether KRMC terminated Plaintiff because she is Native American.

### 1.  Racial Bias Demonstrating Pretext

Plaintiff has offered direct evidence of discriminatory intent.  "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption."  Godwin, 150 F.3d at 1221 (internal quotation marks omitted) (alteration in original).  Where an individual who exhibits bias has significant influence or leverage over the formal decision maker, such evidence is sufficient evidence of discrimination to defeat summary judgment.  Dominguez-Curry, 424 F.3d at 1040 n.5.  "With direct evidence, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial."  Chuang, 225 F.3d at 1128 (citations omitted).

Plaintiff has presented evidence of Chief Nursing Officer Mracek's testimony that she viewed Plaintiff as having a "chip on her shoulder" and not being able to "get past it" – the fact that she was Native American (PRSOF ¶ 25).  KRMC contends that these statements are taken out of context.  Mracek testified as follows:

> Q.  Do you recall, again, other than the incidents leading to the termination, any discipline of Ms. Eakerns, whether you were involved or not?
> A.  You know, I'm trying to think if – I'm not sure.
> ...
> She had an attitude, and it was a known thing that she had an attitude. So whether there were conversations with me by her various managers throughout her years at the hospital about her attitude, I can't honestly tell you, but I know about these things.
> So my gut tells me that, yes, someone has talked to me about it; otherwise, how would I know? Does that make sense?
> Q.  It does.
> A.  I can't tell you who did, and I can't tell you what they said, other than to tell you that when you say "Jeanette," I think "She's got an attitude." She let it be known.
> Q.  Tell me what you mean by "attitude."
> A.  Well, it was a common – it was just common knowledge that she felt that because she was Native American, that somehow or other, the world treated her differently or saw her differently. That was from Jeanette's mind. I'm not saying that's how anyone felt.

1    Q.  When you say, "common knowledge," can you give me any specific
     examples that you base that on?
2    A.   I can't remember any – I cannot specifically remember any
     conversations. I can just tell you that she's got a chip on her shoulder. I'm just
3    being honest with you.
     Q.  Sure. I'm just asking for what you know or what you recall and your
4    truthful testimony.
     A. The fact that she's Native American, to her, she couldn't get past it. It
5    doesn't bother anybody else. Nobody – you don't even think about that she's
     Native American, but she couldn't get past it.
6    Q.  Do you recall having any specific conversations with Ms. Eakerns
     about this issue, this chip on her shoulder?
7    A.  No.

8   (Dkt. 89, Ex. 6, Dep. of Beverly Mracek 31:4-32:23).  As evidenced, Mracek testified that

9   she and other managers viewed Plaintiff as having an attitude about her race.  Mracek also

10  stated that Plaintiff "couldn't get past it" (Id.).  While Mracek qualified these statements by

11  testifying the fact that Plaintiff is Native American does not bother anyone, Mracek reiterated

12  that Plaintiff "couldn't get past it" (Id.).  At worst, Mracek implied that Plaintiff's race is akin

13  to a handicap or condition that she should overcome.  Even taking Mracek's statements at

14  face value, Mracek stated that Plaintiff simply needed to forget that she is Native American.

15  Mracek's statements could be construed as direct evidence of discriminatory animus.  When

16  viewed in a light most favorable to Plaintiff, a jury could conclude that Plaintiff suffered

17  disparate treatment in her employment by being "singled out and treated less favorably than

18  others similarly situated on account of race."  See McGinest, 360 F.3d at 1121 (internal

19  quotation marks omitted).  Even if this evidence of Mracek's testimony is not substantial, this

20  direct evidence creates a triable issue as to the motivation of Mracek and KRMC.  See

21  Chuang, 225 F.3d at 1128 (citations omitted).

22       Furthermore, Mracek, an alleged decision maker, testified that various managers

23  throughout the hospital had conversations with her about Plaintiff.  These managers may

24  have exhibited bias and significant influence or leverage over Mracek, which is also

25  sufficient evidence of discrimination to defeat summary judgment.  See Dominguez-Curry,

26  424 F.3d at 1040 n.5.

27  ///

28  ///

1

### 2.   The Manner of Investigation and Pretext

Plaintiff also presents circumstantial evidence of KRMC's discriminatory intent. Plaintiff argues that the manner in which KRMC investigated her demonstrates pretext. Plaintiff also relies on the differences in KRMC's discipline between her and the similarly situated nurses.

As noted, showing that KRMC treated similarly situated employees outside Plaintiff's protected class more favorably would be probative of pretext.  See Vasquez, 349 F.3d at 641. Individuals are only similarly situated when they have similar jobs and display similar conduct.  Id.  In addition, showing that the same individual conducted investigations is significant because the individual in charge of an investigation has tremendous influence over how the investigation is conducted.  See Hollins v. Atlantic Co., Inc., 188 F.3d 652, 659 (6th Cir. 1999) (holding that, to be similarly situated, an employee must have the same supervisor, be subject to the same standards, and have engaged in the same conduct), cited with approval in, Vasquez, 349 F.3d at 642 n.17; Wheeler v. Aventis Pharms., 360 F.3d 853, 859 (8th Cir. 2004) (finding that technique employed during an investigation is a matter of business judgment).  However, differences in the *type* of discipline in the instant case and other investigations are not evidence that an employer was motivated by discriminatory intent, or that an employer's explanation is not believable for some other reason.  See Vasquez, 349 F.3d at 642 (emphasis added).

Plaintiff presented evidence that Sherer and Riger were accused of similar misconduct or misconduct of comparable seriousness.  See Vasquez, 349 F.3d at 641.  In addition, Plaintiff has shown that Crowl conducted both Plaintiff's and Sherer's investigation (PSOF ¶¶ 28-30).  Although Sherer only received a warning and Riger did not receive any discipline, the differences in the *type* of discipline are not evidence of pretext.  See Vasquez, 349 F.3d at 642.  However, KRMC investigated Sherer for a lengthy period of time, and it did not investigate Riger at all.  In contrast, KRMC terminated Plaintiff after a relatively short investigation, and Plaintiff had no prior warnings or disciplinary reports (PSOF ¶¶ 27-30).

1    The issue before this Court is whether KRMC conducted a thorough investigation and

2    whether they made credibility determinations reasonably and in good faith.  See Villiarimo

3    v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002) (material fact is not whether

4    employee actually committed misconduct, but rather, whether employer "honestly believed

5    its reason for its actions, even if its reason is . . . baseless") (citation omitted).  At the same

6    time, the failure to pursue all leads is not evidence that an investigation was unreasonable.

7    Holly D. v. Calif. Inst. of Tech., 339 F.3d 1158, 1177-78 (9th Cir. 2003); Wheeler, 360 F.3d

8    at 859 (finding that the technique employed during an investigation is a matter of business

9    judgment).

10    In essence, Plaintiff argues that KRMC did not conduct a thorough investigation

11    (PSOF ¶ 30).  KRMC concedes that Crowl's purported "investigation" lasted one day and

12    Crome did not even conduct an investigation before KRMC terminated Plaintiff (DRSOF ¶

13    30).  In contrast, Sherer's investigation lasted over two months (Id.).  KRMC did not

14    interview several people who were present during the backboard incident, such as Reid

15    Smith, Jr., Ann Has the Pipe, or Debra Riger (PRSOF ¶ 17).  When a patient makes a

16    complaint, such as a sexual harassment complaint, KRMC's normal practice is to at least

17    interview the patient (Id.).  While KRMC is not required to pursue all leads, it is a question

18    of fact for the jury whether failing to question several key witnesses before terminating

19    Plaintiff is reasonable.  Plaintiff has raised a genuine dispute of material fact whether KRMC

20    made reasonable, good faith credibility determinations.

21    Plaintiff has offered direct and circumstantial evidence that KRMC's reason for

22    terminating her was not its true motive or that its explanation for her termination is unworthy

23    of credence.  See Bodett v. CoxCom, Inc., 366 F.3d 736, 743 (9th Cir. 2004) (plaintiff may

24    prove pretext either directly by persuading the court that a discriminatory reason more likely

25    motivated the employer or indirectly by showing that the employer's proffered explanation

26    is unworthy of credence).  Therefore, the Court will deny summary judgment as to Plaintiff's

27    race discrimination claims under Title VII and Section 1981.

28    ///

1    **II.     Retaliation under Title VII and Section 1981**

2           Plaintiff alleges retaliation in violation of Title VII and Section 1981 (Dkt. 12, Second

3    Am. Compl. ¶¶ 24, 26-27).  Title VII makes it an unlawful employment practice for an

4    employer to discriminate against an individual because she has opposed any employment

5    practice made unlawful by Title VII, or because she has made a charge, testified, assisted,

6    or participated in any manner in an investigation under Title VII.  42 U.S.C. § 2000e-3(a).

7    To establish a prima facie retaliation claim under Title VII and Section 1981, an employee

8    must show that (1) she engaged in a protected activity; (2) her employer subjected her to an

9    adverse employment action; and (3) a causal link exists between the protected activity and

10   the adverse action.  Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493,

11   506 (9th Cir. 2000); Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000); Little v.

12   Windermere Relocation, Inc., 301 F.3d 958, 969 (9th Cir. 2002).  If plaintiff has shown a

13   prima facie retaliation claim, then the burden shifts to defendant to furnish legitimate

14   nondiscriminatory reasons for the adverse employment action.  Ray, 217 F.3d at 1240.

15          If defendant meets that burden, then plaintiff bears the ultimate burden of

16   demonstrating that the reason was merely a pretext for a discriminatory motive.  Id.  Plaintiff

17   may show pretext "either directly by persuading the court that a discriminatory reason more

18   likely motivated the employer or indirectly by showing that the employer's proffered

19   explanation is unworthy of credence."  Villiarimo, 281 F.3d at 1062.  Circumstantial

20   evidence relied on to show pretext must be "both specific and substantial."  Id.

21          **A.  Protected Activity**

22          Plaintiff filed a sexual harassment complaint and race discrimination complaints on

23   October 27, 2004 prior to her termination.  Plaintiff contends that she had a reasonable belief

24   that Dr. Ward committed sexual harassment when he treated her nephew.  Plaintiff further

25   alleges that KRMC terminated Plaintiff in retaliation for these complaints (PSOF ¶ 6).

26   KRMC argues that the sexual harassment complaint is not a protected activity because Title

27   VII only protects employees, and Reid Smith was not an employee but a patient.

28

1    Title VII provides in relevant part that "[i]t shall be an unlawful employment practice

2    for an employer to discriminate against any of his employees . . . because [the employee] has

3    opposed *any practice made an unlawful employment practice by this subchapter* . . ." 42

4    U.S.C. § 2000e-3(a) (emphasis added).  Title VII is only directed at the eradication of

5    discrimination by employers against employees.  Silver, 586 F.2d at 140-42.  In order to be

6    a protected activity, the plaintiff's opposition must have been directed toward an unlawful

7    employment practice by an employer or an agent of an employer.  See id. (employee's

8    opposition to a racially discriminatory act of a co-employee cannot be the basis for a

9    retaliation action); E.E.O.C. v. Crown Zellerbach Corp., 720 F.2d 1008, 1013-14 (9th Cir.

10   1983) (employee's objections to discriminatory practices by the warehouse personnel

11   manager, on facts presented, constituted objections to discriminatory actions of the

12   employer).  Informal as well as formal complaints or demands are protected activities under

13   Title VII.  See Passantino, 212 F.3d at 506.

14        Only reasonable opposition to the employment practice is protected by Title VII.

15   See, e.g., Wrighten v. Metro. Hosps., Inc., 726 F.2d 1346, 1354-56 (9th Cir. 1984); Crown

16   Zellerbach, 720 F.2d at 1015.  "It is unnecessary that the employment practice actually be

17   unlawful; opposition thereto is protected when it is 'based on a "reasonable belief" that the

18   employer has engaged in an unlawful employment practice.'"  Little, 301 F.3d at 969

19   (quoting Moyo v. Gomez, 40 F.3d 982, 984 (9th Cir. 1994).  The reasonableness of an

20   employee's belief must be assessed according to an objective standard that makes allowance

21   "for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal

22   bases of their claims."  Moyo, 40 F.3d at 985 (holding that the discrimination victims'

23   employment status was irrelevant because plaintiff could bring his retaliation claim either by

24   showing that he was required to discriminate as a condition of his employment or that he had

25   a reasonable belief an unlawful employment practice occurred).  A plaintiff may make a

26   reasonable mistake of fact or law.  Id.  Furthermore, Title VII is construed broadly as it

27   applies to the reasonableness of a plaintiff's belief that a violation occurred.  Id. (citing

28

1    Davis v. Valley Distrib. Co., 522 F.2d 827 (9th Cir. 1975), cert. denied, 429 U.S. 1090

2    (1977)).

3             Plaintiff's belief that Dr. Ward engaged in an unlawful employment practice by

4    sexually harassing her nephew is erroneous.  Plaintiff's nephew is not a KRMC employee,

5    rather he was a patient. Title VII only protects Plaintiff's opposition against a practice made

6    an unlawful employment practice by a Title VII subchapter.  In other words, Title VII only

7    applies to an employer's practices against employees.  However, if Plaintiff had a reasonable

8    belief that Dr. Ward's behavior constituted an unlawful employment practice, even if it was

9    legally or factually erroneous, then Plaintiff engaged in a protected activity when she

10   reported the behavior.  See Moyo, 40 F.3d at 985.  Plaintiff has alleged that she had a

11   reasonable belief.   In addition, Plaintiff has produced evidence of KRMC's sexual

12   harassment policy, which states that "Kingman Regional Medical Center **will not tolerate**

13   sexual harassment of or harassment by its employees, physicians, patients, or visitors" (Dkt.

14   89, Ex. 15) (emphasis in original).  The fact that KRMC specifically included patients in its

15   sexual harassment policy may have led Plaintiff to reasonably believe that Dr. Ward's actions

16   were unlawful under Title VII.  For similar reasons, Plaintiff's other complaints about

17   KRMC's treatment of patients, many of whom were family members, may also be considered

18   protected activities.[5]  If KRMC specifically included patients in its anti-discrimination

19   policies, then Plaintiff may have had a reasonable belief within the Title VII context.

20

21             [5] In 2000, Plaintiff reported to Chief Nursing Officer Mracek of staff making negative
      comments about Native American patients, such as "I have this drunk Indian over there" (Dkt. 78,
22   Ex. 11). In 2000, Plaintiff complained to CEO Brian Turney that her aunt had been airlifted from
      the Reservation to KRMC but was deceased on arrival, yet the ED physician did not tell her or her
23   family that the aunt had died (PSOF ¶ 25). In 2002, Plaintiff's daughter received substandard care
      for a ruptured appendix, and the nurses acted like they "did not want to touch her" (Dkt. 78, Ex. 11).
24   In March 2004, the ED admitted Plaintiff's sister for severe abdominal pain (Id.).  However, the
      nurses initially ignored her pleas for help and called security (Id.).  After Plaintiff intervened, her
25   sister was diagnosed with kidney stones (Id.).  Another nurse told Plaintiff that the ED staff had not
      treated her sister because they thought she was a drug addict seeking drugs (Id.).  On October 27,
26   2004, Plaintiff complained to Mracek that ICU Manager Dan Emborsky had discriminated against
      her brother-in-law on the basis of race (PSOF ¶ 46).  Plaintiff also complained that the ED had
27   denied medical care to her nephew, Nick Bravo (Id. ¶ 48).
28

1      In addition, KRMC ignores the race discrimination complaint that Plaintifff made in

2  conjunction with the sexual harassment complaint (See Dkt. 90, 11:26-27). Neither party has

3  alleged that the simultaneous race discrimination complaint did not pertain to Plaintiff.

4  Viewing the facts in the most favorable light to Plaintiff, the race discrimination complaint

5  was a protected activity.  Furthermore, Plaintiff made other informal and formal race

6  discrimination complaints prior to her termination.  By presenting evidence of a sexual

7  harassment complaint and race discrimination complaints, Plaintiff has established the first

8  element of a prima facie claim for disparate treatment – she engaged in a protected activity.

9      **B.  Adverse Employment Action**

10     On November 4, 2004, KRMC terminated Plaintiff.  Actions such as firing and

11  demoting are adverse employment actions for purposes of a retaliation claim. See Burlington

12  No. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); see also Ray, 217 F.3d at 1242-

13  43 (an adverse action is an action that a reasonable employee would have found materially

14  adverse, which means it might have "dissuaded a reasonable worker from making or

15  supporting a charge of discrimination"). Thus, Plaintiff has established the second element

16  of a prima facie claim that she suffered an adverse employment action.

17     **C.  Causal Link**

18     KRMC argues that Plaintiff cannot show a causal link between a protected activity

19  and the employment decision (Dkt. 77, 14:1-5).  To establish causation, Plaintiff relies on

20  timing (Dkt. 90, 12:16-13:1).

21     Proximity of time between protected activity and an adverse action may support an

22  inference of causation.  Ray, 217 F.3d at 1244.  "It is [also] important to emphasize that it

23  is *causation*, not temporal proximity itself, that is an element of plaintiff's prima facie case,

24  and temporal proximity merely provides an evidentiary basis from which an inference can

25  be drawn." Porter v. Cal. Dept. of Corr., 419 F.3d 885, 895 (9th Cir. 2005) (emphasis added)

26  (citing Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)).  Thus, the

27  court must look not only to timing but to all of the circumstances to determine whether an

28

1    inference of causation is possible.  See Coszalter v. City of Salem, 320 F.3d 968, 978 (9th
2    Cir. 2003).

3              Plaintiff asserts that a causal connection between the complaints and KRMC's
4    decision to terminate her may be inferred from the temporal proximity.  Plaintiff made her
5    complaints just eight days before KRMC discharged her (PSOF ¶ 30).  Plaintiff also made
6    other race discrimination complaints, including a formal complaint to the HR Director less
7    than four months before on July 1, 2004 (Id. ¶ 52).  KRMC contends that this complaint
8    related to a situation that occurred in November 2003 (Dkt. 77, 14:1-5).  However, the Court
9    looks at the proximity of time between the adverse action and the protected activity, i.e. when
10   Plaintiff opposed an unlawful employment practice, not when the incident occurred.  See
11   Ray, 217 F.3d at 1244.  Even so, the complaints made four months earlier may not establish
12   a causal connection, but the complaints made just eight days before KRMC discharged
13   Plaintiff can establish causation.  See Clark County School Dist. v. Breeden, 532 U.S. 268,
14   273-74 (2001) (holding that the temporal proximity must be "very close" and finding that a
15   one to four-month period is insufficient to establish a nexus based on temporal proximity
16   alone).

17             Moreover, other circumstances besides the timing lead to an inference of causation.
18   See Coszalter, 320 F.3d at 978.  CFO/COO Larry Lewis is one of the four alleged decision
19   makers (Dkt. 90, 4:8-5:19).  Plaintiff alleges that after she confronted Lewis about Dr.
20   Ward's alleged sexual harassment, Lewis became angry and stated that he would investigate
21   her for removal of the backboard (PSOF ¶ 49).  Lewis's statement is also evidence of a
22   causal link between Plaintiff's protected activity and her termination.  The Court finds that
23   Plaintiff has raised a genuine issue of material fact regarding a causal link because she
24   presents evidence to support an inference of causation.

25             **D. Legitimate and Non-discriminatory Reasons**

26             KRMC asserts it based the termination decision solely upon legitimate
27   nondiscriminatory reasons and not in retaliation for Plaintiff's sexual harassment and race
28   discrimination complaints (Dkt. 77, 11:11-16).  Therefore, KRMC contends that the

1  legitimate nondiscriminatory reasons destroy the nexus between the protected activity and

2  the adverse employment action (Id.).  As noted, KRMC has furnished these legitimate non-

3  discriminatory reasons for terminating Plaintiff:  practice outside the scope of her nursing

4  license, interference with patient treatment, and unprofessional behavior.  Now, Plaintiff

5  bears the ultimate burden of demonstrating that the reasons were merely a pretext for a

6  discriminatory motive.  Ray, 217 F.3d at 1240.

7       **E.  Pretext**

8       Although KRMC does not use the term pretext, KRMC argues that its legitimate,

9  nondiscriminatory reasons destroy the timing presumption and causal link (Dkt. 92, 8:23-27).

10 Once again, KRMC did not advance a pretext argument until its reply, and Plaintiff did not

11 have the opportunity to respond to this argument.  Regardless, Plaintiff has shown pretext

12 through direct evidence that decision makers were biased towards her and her discrimination

13 complaints.  See Villiarimo, 281 F.3d at 1062.  Mracek, an alleged decision maker, viewed

14 Plaintiff as having a "chip on her shoulder" and not being able to "get past it" – the fact that

15 she was Native American (PRSOF ¶ 25).  In addition, Crome and Clark told Crowl that

16 Plaintiff had "a history of creating problems centered around . . . discrimination claims" (Id.).

17 These statements demonstrate that KRMC was biased towards Plaintiff and her

18 discrimination claims.  KRMC may have viewed Plaintiff's discrimination complaints as

19 problematic or did not take them seriously.  Viewed in a light most favorable to Plaintiff,

20 Plaintiff has produced evidence sufficient to create a genuine issue of material fact that

21 KRMC's reasons for terminating her were mere pretext.

22 **III.   Intentional Infliction of Emotional Distress**

23      In order to prevail on a claim of intentional infliction of emotional distress (IIED)

24 under Arizona law, a plaintiff must prove three elements:  (1) the conduct by the defendant

25 must be "extreme" and "outrageous"; (2) the defendant must either intend to cause emotional

26 distress or recklessly disregard the near certainty that such distress will result from his

27 conduct; and (3) severe emotional distress must indeed occur as a result of defendant's

28 conduct.  Citizen Publ'g Co. v. Miller, 210 Ariz. 513, 516, 115 P.3d 107, 110 (2005) (citing

1    Ford v. Revlon, Inc., 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987)); Johnson v. McDonald, 197

2    Ariz. 155, 160, 3 P.3d 1075, 1080 (Ct. App. 1999).

3            For the first element, a plaintiff must show that the defendant's conduct was "so

4    outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

5    decency, and to be regarded as atrocious and utterly intolerable in a civilized community."

6    Johnson, 197 Ariz. at 160, 3 P.3d at 1080 (citing Cluff v. Farmers Ins. Exch., 10 Ariz. App.

7    560, 562, 460 P.2d 666, 668 (1969)).  Even if a defendant's conduct is unjustifiable, it does

8    not necessarily rise to the level of "atrocious" and "beyond all possible bounds of decency"

9    that would cause an average member of the community to believe it was "outrageous."

10   Nelson v. Phoenix Resort Corp., 181 Ariz. 188, 199, 888 P.2d 1375, 1386 (Ct. App. 1994)

11   (citations omitted).  This standard distinguishes "true claims from false ones, and . . . the

12   trifling insult or annoyance from the serious wrong."  Godbehere v. Phoenix Newspapers,

13   Inc., 162 Ariz. 335, 339, 783 P.2d 781, 785 (Ariz. 1989) (quotation omitted).  The court

14   determines whether the acts at issue are sufficiently outrageous to state a claim for relief.

15   Johnson, 197 Ariz. at 160, 3 P.3d at 1080 (citing Mintz v. Bell Atlantic Sys. Leasing Int'l,

16   Inc., 183 Ariz. 550, 554, 905 P.2d 559, 563 (Ct. App. 1995)).  Only if reasonable minds

17   could differ about whether the conduct is sufficiently outrageous does the jury decide the

18   issue.  Id.

19           In the employment context, "it is extremely rare to find conduct . . . that will rise to

20   the level of outrageousness necessary to provide a basis for recovery for the tort of

21   intentional infliction of emotional distress."  Mintz, 183 Ariz. at 554, 905 P.2d at 563

22   (quoting Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988), cert. denied, 498

23   U.S. 811 (1990)).  Termination decisions and circumstances surrounding an employer's

24   method of discharging an employee, whether wrongful or not, generally do not rise to a level

25   of conduct extreme enough to establish an IIED claim.  Id.; Nelson, 181 Ariz. at 200, 888

26   P.2d at 1387.

27           In this case, Plaintiff alleges that she suffered severe emotional distress as a result of

28   the November 4, 2004 termination (PSOF ¶ 58).  However, Plaintiff has not shown that

1    KRMC's termination of her constituted "extreme" or "outrageous" conduct. Her termination

2    occurred in the employment context, where it is extremely rare to find conduct that rises to

3    the level of extreme and outrageous. See Mintz, 183 Ariz. at 554, 905 P.2d at 563. Plaintiff

4    only alleges that KRMC terminated Plaintiff without hearing her side of the story, without

5    seeking the advice of counsel, and without Crome conducting an investigation into the

6    backboard incident (PSOF ¶ 57). Further, Plaintiff alleges that KRMC was "motivated by

7    a desire to retaliate against Eakerns for raising discrimination complaints and by racial, sex

8    and national origin discrimination" (Dkt. 90, 14:13-14). Even assuming that KRMC

9    wrongfully terminated Plaintiff under Title VII, KRMC's conduct involved behavior that a

10   reasonable finder of fact would find less "outrageous" than other tortfeasors. See Craig v.

11   M & O Agencies, Inc., 496 F.3d 1047, 1059 (9th Cir. 2007) (distinguishing plaintiff's case

12   where a supervisor repeatedly propositioned her, followed her into the bathroom, grabbed

13   her, and stuck his tongue in her mouth from other Arizona cases that did not find outrageous

14   conduct); Nelson, 181 Ariz. at 199, 888 P.2d at 1386 (finding that even if a defendant's

15   conduct is unjustifiable, it does not necessarily rise to the level of "atrocious" and "beyond

16   all possible bounds of decency" to establish an IIED claim). "In light of the extremely high

17   burden of proof for demonstrating intentional infliction of emotional distress in Arizona,"

18   no reasonable jury could find KRMC's action in terminating Plaintiff "so outrageous in

19   character, and so extreme in degree, as to go beyond all possible bounds of decency, and to

20   be regarded as atrocious and utterly intolerable in a civilized community." See Bodett, 366

21   F.3d at 747; Johnson, 197 Ariz. at 160, 3 P.3d at 1080.

22        As Plaintiff cannot produce sufficient evidence on the first element, the Court need

23   not address the second and third elements of her IIED claim. See Nelson, 888 P.2d at 1386

24   (even if second and third elements of an IIED claim are present, trial court must make a

25   preliminary determination whether conduct may be considered extreme and outrageous).

26   Because Plaintiff cannot produce sufficient evidence of extreme and outrageous conduct, the

27   Court will grant in part summary judgment as to Plaintiff's intentional infliction of emotional

28   distress claim.

1

**CONCLUSION**

2          Summary judgment is not proper as to Plaintiff's claims of race discrimination and

3    retaliation under Title VII and 42 U.S.C. § 1981.  Plaintiff has raised a genuine issue of

4    material fact as to these claims because she has raised an inference that KRMC's legitimate,

5    nondiscriminatory reasons for terminating her were pretext.  On the other hand, Plaintiff has

6    not raised a genuine dispute over a material fact for her IIED claim, and therefore, the Court

7    grants in part summary judgment in KRMC's favor.

8    Accordingly,

9          **IT IS HEREBY ORDERED** that Defendant KRMC's Motion for Summary

10   Judgment (Dkt. 77) is **GRANTED IN PART** as to Plaintiff Eakern's intentional infliction

11   of emotional distress claim and **DENIED IN PART** as to the rest of Plaintiff's claims.

12         **IT IS FURTHER ORDERED** setting a final pretrial conference before the

13   Honorable Stephen M. McNamee for June 1, 2009 at 3:00 p.m. in Courtroom 605 at 401 W.

14   Washington Street in Phoenix, Arizona.

15         **IT IS FURTHER ORDERED** that the parties shall keep the Court apprised of the

16   possibility of settlement and should settlement be reached, the parties shall file a Notice of

17   Settlement with the Clerk of the Court.

18         DATED this 18th day of March, 2009.

19

20

21                                             Stephen M. McNamee
                                               United States District Judge
22

23

24

25

26

27

28

- 26 -